# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00417-CR

**Natalio Chaparro, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NO. 1011635, HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Natalio Chaparro was charged with aggravated sexual assault of an elderly person. *See* Tex. Pen. Code Ann. § 22.021(a)(1)(A)(i), (2)(C) (West 2003). Following a trial to the court, the court found Chaparro guilty of the offense and sentenced him to thirty years in the Texas Department of Criminal Justice Institutional Division. By four issues, Chaparro appeals his conviction. We will overrule those issues and affirm the conviction.

## DISCUSSION

### Sufficiency of the Evidence

By his second issue, Chaparro challenges the factual sufficiency of the evidence to support his conviction. In determining the factual sufficiency of the elements of an offense, the

reviewing court views all of the evidence in a neutral light. *Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). The court reviews the evidence weighed by the fact finder that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact. *Id*. at 7. In conducting its factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). The reviewing court, however, does not substitute its judgment for that of the fact finder and should set aside the verdict only if the evidence is so weak as to be clearly wrong or manifestly unjust or if the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. *Zuliani v. State*, 97 S.W.3d 589, 593 (Tex. Crim. App. 2003); *Johnson*, 23 S.W.3d at 11; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

Travis County Sheriff's Deputy Santiago Salazar testified that on November 3, 2000, he was patrolling southeastern Travis County with his partner Deputy Gray, though they were in separate vehicles. Deputy Gray received a dispatch at about 1:00 p.m. In response to the dispatch, the two deputies drove to a house in Del Valle, where they encountered Hermilio Benitez, Jr., a young Hispanic male, and his father Hermilio Benitiz, Sr. Salazar described the elder Benitez as an older gentleman, who was about 5'1" or 5'2" and about 120 pounds; he spoke only Spanish. Benitez was hunched over when Salazar observed him, and was making moaning sounds and saying, "ay," which Salazar understood as the Spanish expression for "ouch." It was obvious to Salazar that Benitez was in pain and distraught.

When Salazar questioned Benitez, he responded in Spanish that he had been violated. He explained that Chaparro had come to his house the night before to talk about a car deal. The two men eventually left Benitez's house to buy a car battery. They were out drinking, although Benitez did not specify where, and at about midnight ended up at Chaparro's house. Benitez told Salazar that Chaparro then punched him, knocking him to the ground, stripped him of his pants, and penetrated his anus with his penis. Afterwards, Chaparro drove Benitez home. Benitez told Salazar that he was in pain, had no control retaining his feces, and could not stop soiling himself. Salazar observed that Benitez had some redness on his forehead and a dry speckle of blood near his lip and noticed a strong odor of feces about him. As requested, Benitez provided Gray the clothes he was wearing when he was assaulted and the clothes that he wore after he had cleaned himself up. The first set of clothes were soiled with feces and blood, and the second set were soiled only with feces. Deputy Gray transported Benitez to St. David's hospital for a rape examination.

Travis County Sheriff's Detective Chris Orton testified that after reading Salazar's and Gray's reports, he contacted Sergeant Mancias to assist him in obtaining a statement from Benitez. On November 8, Benitez and his son met with Orton and Mancias at Orton's office. During questioning, Benitez's eyes swelled up and watered, and it was obvious that Benitez was still experiencing physical pain, as he had trouble sitting still and shifted from side to side in his chair. Orton also observed dried blood "like a scab" by one of Benitez's eyes and some bruising on his knees, which Orton had photographed. It was obvious to Orton that Benitez was also still having trouble controlling his bowel movements. Orton learned during the interview that Benitez was born in 1931 and was over the age of 65 when the assault occurred.

3

On November 15, Orton drove to Chaparro's home, which was described as the place where the assault occurred. There he encountered Mario Bolanos. Orton questioned Bolanos about the night of November 2, and Bolanos's account corroborated Benitez's report. Orton then obtained an arrest warrant and arrested Chaparro on November 16.

On November 17, Orton visited Chaparro at the jail to serve him with a search warrant for DNA samples (from hair, blood, and saliva), which he obtained. He returned on November 27 to speak with Chaparro. After receiving a written copy of his Miranda rights and having them read to him, Chaparro waived his rights and made a statement. In his statement, Chaparro claimed that sometime in early November, he went to Benitez's house to pick up a car title that Benitez owed him. Chaparro drove Benitez back to his own house to pick up $250, which he owed Benitez for the car. After he paid Benitez, Benitez refused to give Chaparro the title, and the two men began drinking. Afterwards they drove to Chaparro's friend's house; others accompanied the men, including Bolanos. They then returned to Chaparro's house, where they ate shrimp and drank more alcohol. Sometime between 10:30 p.m. and midnight, Chaparro's wife, who had also been at the house, left for work, and Benitez asked to be taken home. Chaparro refused because he was drunk and because the weather was nasty. Eventually, Chaparro agreed to take Benitez home, but he ran out of gas on the way. "One of the boys" went to a gas station, where Chaparro's wife worked, and brought back some gas. Chaparro decided to return to his house because it was storming. Once at the house, Bolanos and the other boys went to their rooms (they were renting from Chaparro), and Chaparro retreated to his bed. All of a sudden Benitez got on his back and acted as if he was going to put his penis in Chaparro's butt. Chaparro pushed him off and onto the floor.

4

Benitez returned to Chaparro and unbuckled Chaparro's pants and started playing with his penis; Benitez tried to kiss him and to suck his penis. Benitez then rolled over and lifted his butt. Chaparro was "not sure if [he] penetrated him or not. It seems like my penis may have just been between his legs. I came, but I'm not sure if it was in him or not." Afterwards, Chaparro drove Benitez home.

Sergeant Manual Mancias, Jr. with the Travis County Sheriff's office testified next. On November 8, Mancias assisted Orton in obtaining a statement from Benitez by translating for him. Mancias testified that he noticed physical injuries on Benitez. He also said that while giving his statement, Benitez became teary-eyed, angry, and embarrassed. Benitez told Mancias that he was still experiencing pain that day.

Mancias later went with Orton to Chaparro's residence, where he came into contact with a man he remembered as Mario. Mancias questioned Mario about the night of November 2, 2000, the night that the assault occurred. Mario's responses corroborated some of what Benitez had told the officers.

The complaining witness, Benitez, testified through the use of an interpreter. Benitez said he had known Chaparro for a few years before the assault occurred; they had once lived near each other. The afternoon of November 2, Chaparro went to Benitez's house at about 3:00 p.m. Chaparro had performed some mechanical work on Benitez's truck, and Benitez had complained to Chaparro about the quality of the work. Chaparro told Benitez that he needed a new battery; so the two men, along with a third man that Benitez remembered as Mario, left Benitez's house in Chaparro's car to buy a battery. Despite Benitez's requests to return to his house, Chaparro instead went to a store, bought a bottle of liquor, and started drinking. The men then went to the home of

5

friends of Chaparro's, where Chaparro continued to drink and smoked marihuana; they stayed there for about two hours. Benitez thought he may have had two or three small glasses of liquor as well.

After Benitez and Chaparro left the friends' house, Chaparro continued to ignore Benitez's requests to return home, and instead the men went to Chaparro's house; it was almost 2:00 a.m. by then. Once inside, Chaparro went to his bed, and Benitez laid on the floor in the bedroom; Mario was in another room. Then Chaparro got out of bed, went to Benitez, put his hand over Benitez's mouth, and started taking off Benitez's underwear. The two men started struggling, Chaparro shoved Benitez, and Benitez fell and hit himself. Chaparro put his penis in Benitez's anus, causing him a lot of pain and bleeding. Later that morning, Chaparro returned Benitez to his home. Once home, Benitez called his son to report what had happened to him. His son in turn called the police. Benitez said he had to wear diapers for over a month after the assault occurred because he could not control his bowel movements, and at the time of trial, was still experiencing pain.

Benitez's son, Jr.,[1] also testified. Benitez called his son after he returned home the morning of November 3 and explained what had happened to him; Jr. immediately went to his father's house. When Jr. arrived, Benitez was crying and appeared to be in a lot of pain; he could barely walk. After hearing Benitez explain that Chaparro assaulted him, Jr. called the police. He said that it took two or three months before his father recovered from his injuries.

---

[1] We refer to Hermilio Benitez, Jr. as "Jr." throughout this opinion only to distinguish him from his father, Hermilio Benitez, Sr.

6

On cross-examination, Jr. admitted that he initially told Deputy Gray that he understood that his father "went with a friend [Chaparro] to his friend's house and got drunk of alcohol and smelled marijuana." He also testified that by the time he arrived at his father's house, his father had been drinking beer.

Janet Difranco is the sexual assault nurse examiner (SANE) who examined Benitez at St. David's hospital on November 3. Deputy Salazar translated for Difranco and Benitez. Difranco testified that Benitez, through Deputy Salazar, told her he had been punched on his face and then sexually assaulted. He further stated that he had already wiped his genital area, had already urinated, had a bowel movement, vomited, and had changed his clothes since the assault. She described Benitez's injuries as an abrasion to his left chin area, scabs around his eyes (which may have been old), scratches on his inner right thigh, and a red area with tenderness on his inner left thigh.

Difranco performed a detailed anal/genital exam and observed severe injuries: several areas of lacerations around the anus and two abrasions on either side of the anus, one of which was bleeding. Because Benitez complained that he had been bleeding, Difranco summoned a physician and together, they performed an internal exam of Benitez's rectum, where they discovered a "pretty large laceration internally of his rectum," which was bleeding. Difranco testified that she had not seen injuries that serious to an anal cavity in any of the SANE exams that she had performed, and she had performed about 110 SANE exams. The injuries were consistent with Benitez's description of the assault. Difranco opined that the injuries could "possibly" result in a loss of bowel movements. The physician who assisted her suggested that Benitez's treatment might require a

7

surgical component. As part of her exam, Difranco collected Benitez's underwear, which had stool and blood in the crotch area.

After the State rested its case, the defense recalled Benitez to testify. He denied having had any alcoholic beverages after he got home the morning of November 3.

Wilson Young, a DNA analyst with the Texas Department of Public Safety, testified that he performed DNA analyses on semen samples obtained during Benitez's SANE exam. Following his analysis, Young was unable to determine a DNA profile from the individual that contributed the semen that was obtained during the SANE exam. On cross-examination, Young explained that an insufficient number of spermatozoa were present to be able to determine from whom the semen may have originated. He agreed that if a victim has washed his anal cavity after a sexual assault, that can affect how much spermatozoa is present.

Kathleen Benitez, Chaparro's wife, testified that she was at home the night of November 2. Chaparro arrived at about 10:30 that night with Benitez, Mario Ramirez, and Mario's three brothers. All but one were "plastered." They had been at a friend's house since about 8:00 or 9:00 that night. The men continued drinking when they returned to Chaparro's house, and Kathleen made shrimp cocktails for them. Benitez communicated that he wanted to go home, but Chaparro would not take him because it was raining and he was too drunk to drive. Kathleen left for work at a nearby convenience store at about 10:45. While at work, one of the men who had been with Chaparro went to the store to collect some gas because Chaparro had run out while driving. Chaparro and the young man went back to the store before returning to Chaparro's home. There, Chaparro called Kathleen, and told her he was going to take Benitez back home. He stopped at the

8

store again on the way, and Kathleen saw Benitez in Chaparro's truck. The other men were also present, and everyone appeared to be okay. This was at about 2:45 a.m. When Kathleen returned home later that morning (about 9:00), Benitez was not present.

On cross-examination, Kathleen testified that Chaparro told her that Benitez had fondled him the night of November 2, but he did not remember having sex with him. Chaparro told her that while he was sleeping, Benitez, who had been lying on the floor in front of Chaparro, had unbuckled Chaparro's pants, pulled them down, and was "playing with him." Chaparro told Kathleen that he knew he had touched Benitez, but he did not know if he had done anything else with him.

Chaparro testified in his defense; his testimony was consistent with his wife's and his previous statement to the police. He said he first went to Benitez's house at 6:00 p.m. on November 2 to obtain the title to a car he intended to buy from Benitez. Benitez told Chaparro he would give him the title to the car as soon as Chaparro paid an additional $250. Chaparro agreed and asked Benitez to accompany him back to his house to pick up the money. Chaparro planned to first stop and visit some friends and family. At Chaparro's house, the men were accompanied by at least four other men. They drank beer there, ate shrimp cocktail, and Chaparro played guitar for everyone. Kathleen had been there as well, but left just before 11:00. At 1:00 a.m., the six men left to take Benitez home. The truck, however, ran out of gas, and one of the men went to the convenience store where Kathleen worked to pick up some gas. They then returned to the convenience store, where they noticed a storm approaching. Chaparro suggested, and Benitez agreed, that they should wait until the storm ended before attempting to drive to Benitez's house. So, they returned to Chaparro's

9

home. Once there, the men continued drinking until about 3:00 a.m., when Chaparro went to sleep. Benitez continued drinking all night long. At some point while Chaparro was asleep, he felt someone poking at him. When he looked up, he saw Benitez with his penis outside of his pants. Chaparro tried going back to sleep after telling Benitez to do the same. But Chaparro again awoke to find Benitez on top of him, touching Chaparro's penis. Benitez's pants were pulled down and his penis was outside of his pants. As Chaparro tried to push Benitez aside, his blue jeans fell down and he ejaculated and got his semen on Benitez's leg and clothing. He stated that he did not penetrate Benitez. Afterwards, Benitez began drinking again. Chaparro cleaned himself up and took Benitez home.

In sum, Benitez and Chaparro provided conflicting accounts about what happened the night of November 2, 2000. The extent of Benitez's injuries as described by Difranco corroborated Benitez's version of events. The trial court as fact finder was the exclusive judge of the weight to be given the testimony and the credibility of the witnesses. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). The trial court was free to reject or accept any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). Viewing the evidence in a neutral light, we cannot say that the evidence is so weak as to be clearly wrong or manifestly unjust or that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. We overrule Chaparro's second issue.

By his first issue, Chaparro challenges the legal sufficiency of the evidence to support his conviction. Under a legal sufficiency review, we view the evidence in the light most favorable

10

to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Staley v. State*, 887 S.W.2d 885, 888 (Tex. Crim. App. 1994). Any inconsistencies in the evidence should be resolved in favor of the verdict. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987).

Chaparro argues on appeal that the evidence is legally insufficient to support his conviction because even though Benitez identified Chaparro as the person who assaulted him, the DNA lab report exonerates him. The lab report states in pertinent part: "The DNA profile of the sperm cell fraction of the anal swab is not consistent with the DNA profile of suspect, [Chaparro]. [Chaparro] is excluded as a contributor to the anal swab." The DNA analyst, Wilson Young, testified at the trial, however, that he was unable to determine a DNA profile from the individual that contributed the semen, explaining that an insufficient number of spermatozoa were present to be able to determine from whom the semen may have originated. Chaparro relies on *Roberson v. State*, 16 S.W.3d 156 (Tex. App.—Austin 2000, pet. ref'd), in support of his argument that "[i]f DNA is legally sufficient, alone, to establish guilt, it ought to be legally sufficient, alone to establish innocence."

Chaparro correctly characterizes the issue in *Roberson* as whether DNA evidence alone is legally sufficient to establish the identity of the perpetrator of the crime. Here, however, we are not presented with only DNA evidence to establish the identity of the perpetrator. Instead, the

11

court had before it evidence in the form of the lab report, Young's testimony, and Benitez's eyewitness testimony. Although the lab report weighed in favor of Chaparro's innocence, the results included in that report were contradicted by Young, thus producing two conflicting forms of evidence as to whether Chaparro could be excluded as the contributor of the semen. The trial court also had before it the uncontradicted, eyewitness testimony of Benitez. In addition, Chaparro acknowledged that he was with Benitez the night of the assault. His identity was not at issue during the trial. Rather, his defense was that Benitez initiated and consented to the sexual encounter.

Young's and Benitez's credibility and the weight to be given the lab report were issues for the fact finder, which had the responsibility of weighing all the evidence, resolving evidentiary conflicts, and drawing reasonable conclusions from the evidence. *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001). The fact finder may believe a witness even though some of the witness's testimony may conflict with other evidence in the record. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). The fact finder was free to believe Benitez's and Young's testimony at trial even though it was not confirmed by the lab report. Any contradiction went only to the weight of the evidence. Thus, the trial court did not err in considering evidence other than the lab report to determine that Chaparro was the person who assaulted Benitez. We conclude that the evidence was legally sufficient to support the conviction and overrule Chaparro's first issue.

## Motion for New Trial

By his third issue, Chaparro complains that the trial court erred by overruling his motion for new trial based on newly discovered psychiatric evidence that might have led to a verdict

12

of not guilty by reason of insanity. Article 40.001 of the code of criminal procedure provides that a new trial shall be granted "where material evidence favorable to the accused has been discovered since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (West Supp. 2003). We employ a four-part test to determine whether a new trial should have been granted under this provision:

(1)  the newly discovered evidence was unknown or unavailable to the movant at the time of his trial;

(2)  the movant's failure to discover or obtain the evidence was not due to a lack of diligence;

(3)  the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and,

(4)  the new evidence is probably true and will probably bring about a different result on another trial.

*Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002) (footnote omitted). The trial court has discretion to decide whether to grant a new trial based on newly discovered evidence, and we will not disturb that decision absent an abuse of discretion. *Id.* at 37.

The "newly discovered" evidence that Chaparro urges entitled him to a new trial is a psychiatric report prepared after trial by Dr. Cantu. Chaparro argues that the report suggests he has a mental illness; he insists that had he discovered the report before, he would have asserted the defense of not guilty by reason of insanity. The psychiatric report states that the examining doctor, Dr. Cantu, found that Chaparro presently suffers from an active and serious mental illness, possibly delusional disorder, major depressive disorder with psychotic features, or an organic psychotic

13

(delusional) disorder. He further found Chaparro competent to stand trial,[2] but he had "serious and active concerns" about Chaparro's "ability to conform his behavior to expected societal/legal norms because his mental illness substantially impairs his thought, perception of reality, emotional process, and judgment."

The defense of insanity requires that a defendant prove that as a result of a severe mental disease or defect, at the time of the commission of the offense, he did not know that his conduct was wrong. Tex. Pen. Code Ann. § 8.01(a) (West 2003). The psychiatric report to which Chaparro refers includes nothing that suggests he may have suffered from a mental disorder at the time he committed the sexual assault. As the State points out, Dr. Cantu did not address whether Chaparro knew right from wrong at the time of the assault. The assault occurred about a year and a half before Chaparro was examined by Dr. Cantu. Indeed, Chaparro's trial counsel, Joe Taylor, testified that at the outset of his interactions with Chaparro, Taylor had no reason to suspect that Chaparro might have been insane at the time of the assault. Thus, we cannot say that the newly discovered evidence would have probably resulted in a different outcome in another trial and the trial

---

[2] Before the trial, Chaparro had been examined by another doctor, Dr. Coon, who also determined that Chaparro was competent to stand trial. Dr. Coon made no comments about a mental disorder. Chaparro was charged with driving while intoxicated after he had been arrested for sexually assaulting Benitez. Chaparro's trial counsel, Joe Taylor, requested another psychiatric examination to determine whether Chaparro was competent to stand trial for the driving while intoxicated offense. Dr. Cantu examined Chaparro and prepared his psychiatric report after the trial on the sexual assault charge.

court abused its discretion in refusing to grant a new trial based on this evidence. Chaparro's third issue is overruled.

By his fourth issue, Chaparro complains that the trial court erred in sustaining an objection to medical evidence testimony during the motion for new trial hearing. During the hearing, Chaparro's trial counsel, Taylor, was asked if Dr. Cantu, the examining doctor, made any observations about Chaparro to Taylor. The State objected based on hearsay. Chaparro then offered Dr. Cantu's psychiatric report into evidence. The trial court did not state whether it was admitting the report into evidence, but did sustain the State's hearsay objection. Chaparro argues that he should have been allowed to question Taylor about Dr. Cantu's remarks regarding Chaparro. Chaparro, however, did not file a bill of exception; thus, he has failed to preserve error, as we are unable to determine the content of the testimony that was withheld from the hearing. *See* Tex. R. App. P. 33.2.

In any event, it is clear that the trial court considered Dr. Cantu's psychiatric report in deciding to overrule the motion for new trial. The trial court explained: "But even after trial, a different doctor looked at the defendant and said he was competent to stand trial, so I don't have any question about that. . . . I don't think that even Dr. Cantu indicated that the defendant was insane -- or -- insane at any time; he just said he had mental health problems." Thus, if there were any error in refusing to allow Taylor's testimony regarding Dr. Cantu's observations, the error was harmless, as Dr. Cantu's observations were printed in his psychiatric report, which the trial court clearly considered. Chaparro's fourth issue is overruled.

## CONCLUSION

Having overruled all of Chaparro's issues, we affirm his conviction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   September 25, 2003

Do Not Publish

16